**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                    )
NUVASIVE, INC. and                 )
THERMAL SURGICAL, LLC       )
                                    )
v.                                    )        No. _____
                                    )
A2 MEDICAL, INC.                  )
_____)

**COMPLAINT**

By and through their counsel of record, and for their Complaint against Defendant, A2 Medical, Inc. ("Defendant"), Plaintiffs, NuVasive, Inc. ("NuVasive") and Thermal Surgical, LLC ("Thermal Surgical") (collectively, "Plaintiffs"), state that:

**Introduction**

1.      Plaintiffs file this suit because Defendant aided and abetted their former exclusive sales representative, Jeff Brown ("Brown"), in breaching his common law and contractual obligations not to compete during his tenure as their sales representative, procured Brown's continued violation of his contractual non-compete obligations after Thermal Surgical terminated Brown's employment, rewarded Brown for illegally converting business, and then destroyed relevant evidence related to its and Brown's bad acts.

**The Parties**

2.      NuVasive is a Delaware corporation with its principal place of business in San Diego, California.

3.      Thermal Surgical is a Vermont limited liability company with its principal place of business in Burlington, Vermont.

4.      Defendant is a Massachusetts corporation with its principal place of business in Middleton, Massachusetts.

## Jurisdiction and Venue

5.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as this is a civil action between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Defendant because it is a Massachusetts corporation with its principal place of business in Massachusetts.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district and because the events and actions giving rise to the claims occurred primarily and substantially in Massachusetts.

## Factual Allegations Related to All Counts

### Background

8.      NuVasive is an innovative medical device company focused on the design, development, and marketing of products and procedures for the spine.

9.      NuVasive distributes its products through its highly-trained sales force which consists of internal sales representatives and exclusive outside distributors.

10.      Thermal Surgical is one of NuVasive's exclusive outside distributors.

11.      Defendant is in the business of distributing medical devices which compete with those designed, manufactured, and marketed by NuVasive, including, without limitation, those designed, manufactured, and marketed by Spineology, LDR, Zimmer Biomet (formerly Lanx), Pinnacle Spine, Osseus, and Captiva Spine ("Defendant's Products").

12.   The spinal hardware industry is highly competitive.  Participants in this industry entrust their sales representatives with confidential and proprietary information, give those sales representatives access to their established customers, and often provide sales representatives with proprietary training.   Accordingly, the industry's standard and practice is to require sales representatives to sign confidentiality agreements, as well as non-competition and/or non-solicitation agreements upon hire.

13.   Defendant knew or should have known of Brown's confidentiality, non-competition, and non-solicitation obligations at all relevant times.

**NuVasive hires Brown as its sales representative**

14.   Brown began working for NuVasive as a sales representative in New Hampshire and Maine on April 2, 2007.  Brown had no experience in the medical device industry prior to becoming NuVasive's employee.

15.   As a condition of his employment, Brown agreed to and signed a Statement Regarding Proprietary Information, Inventions Assignment and Non-Competition Agreement (the "PIIA") on March 12, 2007.  Plaintiffs attach a copy of the PIIA as **Exhibit A**.

16.   Prior to being allowed into his sales territory, and throughout his tenure as a NuVasive sales representative, Brown received specialized training from NuVasive.

17.   NuVasive entrusted Brown with its confidential and proprietary information, and, after training Brown, gave him a sales territory which included established NuVasive customers.

18.   Brown's responsibilities as a NuVasive sales representative included promoting NuVasive's products to surgeons and medical facilities, supporting surgeries in which surgeons utilized NuVasive's products, and generating goodwill with NuVasive's current and prospective customers.

**Brown transitions to Thermal Surgical**

19.     Thermal Surgical became one of NuVasive's exclusive distributors in early 2013.

20.     On or about June 30, 2013, Brown transitioned from a NuVasive employee to a Thermal Surgical employee.  Generally speaking, Brown's responsibilities remained the same after this transition, and included promoting NuVasive's products to surgeons and medical facilities, supporting surgeries in which surgeons utilized NuVasive's products, and generating goodwill with NuVasive's current and prospective customers.

21.     Thermal Surgical and NuVasive continued to provide Brown with specialized training after he became a Thermal Surgical employee.

22.     As a condition of his employment with Thermal Surgical, Brown agreed to and signed a Sales Representative and Employment Agreement (the "2013 Agreement").  Plaintiffs attach a copy of the 2013 Agreement as **Exhibit B.**

23.     On or about January 5, 2014, Thermal Surgical and Brown entered into a new Sales Representative and Employment Agreement (the "2014 Agreement"), which is incorrectly dated January 1, 2013.  Plaintiffs attach a copy of the 2014 Agreement as **Exhibit C**.

24.     NuVasive is a third-party beneficiary to the 2013 and 2014 Agreements.

25.     The second full paragraphs of the 2013 and 2014 Agreements note that, pursuant to the terms and conditions of Thermal Surgical's Exclusive Sales Representative Agreement with NuVasive, "Thermal Surgical is the exclusive agent to sell NuVasive's products."

26.     The third full paragraphs of the 2013 and 2014 Agreements provide that Thermal Surgical employs Brown to sell NuVasive's products.

27.     The second full page of the 2013 and 2014 Agreement begins with a section titled "Conflicts of Interest."  It provides, in relevant part:

> Representative represents and warrants to Thermal Surgical that it does not (nor does any entity or person affiliated with it) currently represent or promote any lines or products that are competitive with any NuVasive Product or with Thermal Surgical, and that it shall not (nor shall any entity or person affiliated with it) during the Term, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory (i) any lines or products that are competitive with any Product (sic) covered by this Agreement or (ii) any NuVasive products for use in spine surgery.  Further, during the Term, Representative shall not, directly or indirectly, represent, promote, sell or otherwise commercialize any products (other than the Products) without the written consent of Thermal Surgical.
>
> …
>
> Representative shall devote substantially all of his business time and attention to the performance of his duties hereunder and will not engage in any other business or profession or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of Thermal Surgical.

28.     Consistent with the section titled "Conflicts of Interest," Exhibit A to the 2013 and 2014 Agreements limits products Brown could sell on behalf of Thermal Surgical to "All NuVasive Products."

29.     Thermal Surgical never gave Brown permission to sell products that were not associated with NuVasive.

30.     Section 5.5 of the 2013 and 2014 Agreements impose certain reasonable employment and post-employment obligations on Defendant, including duties of non-competition and non-solicitation.

31.     Section 5.5 of the 2014 Agreement provides, in relevant part:

> During Representative's employment and for a period of eighteen (18) months following the expiration or termination of such employment, Representative shall not (i) develop, represent, promote or otherwise try to sell within the Territory any lines or products that, in Thermal Surgical's reasonable judgment, compete with the NuVasive Products covered by this Agreement, (ii) solicit (directly or indirectly) any current or former customers of Thermal Surgical or NuVasive to purchase any products or lines that are, in the Company's reasonable judgment,

competitive with the Products covered by this Agreement, or (iii) solicit or offer work to, directly or indirectly, any of Thermal Surgical's or NuVasive's employees, agents or representatives.

Thermal Surgical and Representative acknowledge and agree that the foregoing non-competition covenants are reasonable and necessary to protect the legitimate interests of Thermal Surgical, including without limitation, the protection of Confidential Information.  Representative further acknowledges and agrees that such covenants are an essential part of, and consideration for, Thermal Surgical's promises contained in this Agreement. …

32.      The 2013 Agreement's non-competition and non-solicitation clause is identical to the 2014 Agreement non-competition and non-solicitation clause, except its temporal term is 15 months.

33.      The non-competition and non-solicitation clauses in the 2013 and 2014 Agreements are narrowly tailored to protect Thermal Surgical's and NuVasive's legitimate business interests. As Plaintiffs' sales representative, Brown received Thermal Surgical's and NuVasive's confidential information, received specialized training, had access to their established customer bases, and was charged with generating goodwill with new and existing customers on their behalf.

34.      The temporal and geographic restrictions in the 2013 and 2014 Agreements' non-competition and non-solicitation provisions are reasonable.  The temporal restrictions are only for fifteen (15) and eighteen (18) months, respectively, after Brown's employment terminates; and the geographic restriction is limited to the territories where Brown marketed NuVasive's products on behalf of Thermal Surgical.

**Brown inherited NuVasive's business at LRGH when NuVasive hired him in 2007**

35.      Lakes Region General Hospital ("LRGH") was an established NuVasive customer when NuVasive hired Brown in 2007.

36.     Throughout his relationship with NuVasive, LRGH, including the two surgeons, Drs. Salerni and Lieberman, who regularly perform spine surgeries at that hospital (the "LRGH Surgeons") was Brown's largest customer.

37.     Prior to the late summer/early fall of 2014, the LRGH Surgeons used NuVasive products for the majority of their procedures.

38.     Upon information and belief, Defendant sold no products to LRGH prior to the summer of 2014.  Also upon information and belief, between January 1, 2014, and July 30, 2014, the LRGH Surgeons utilized no products manufactured and/or marketed by the companies whose products Defendant distributes.

**Brown begins marketing Defendant's products to LRGH while still employed by Thermal Surgical**

39.     Defendant and Brown began discussing the prospect of Brown joining Defendant sometime in 2014.

40.     On or before June 10, 2014, Brown created a personal email account – jbnh926@gmail.com ("Personal Email").  On June 10, 2014, Brown sent "test" emails to his Personal Email and another personal email address he utilized, jbnh1@outlook.com.

41.     Brown telephoned Defendant's former representative, Myles Wilson ("Wilson"), on August 14, 2014.  Upon information and belief, Brown and Wilson discussed converting Plaintiffs' business at LRGH to Defendant, and the manner in which Defendant would compensate Brown for his efforts during this telephone call.

42.     On August 28, 2014, Wilson emailed information about one of Defendant's Products that competes with NuVasive's products to Brown.

43.     Shortly after the above-referenced August 28, 2014 email, Brown scheduled a dinner with one of the LRGH Surgeons for September 24, 2014, at the Chop House in Manchester,

New Hampshire. Upon information and belief, one or more of Defendant's representatives, Brown, and one or both of the LRGH Surgeons attended this dinner.

44.     At some point in the summer or early fall of 2014, Brown and Defendant convinced the LRGH Surgeons to move their business from Plaintiffs to Defendant.

45.     LRGH's use of NuVasive's products plummeted in August/September 2014 because the LRGH surgeons suddenly and without warning (to Plaintiffs) began utilizing Defendant's products.

46.     Brown worked closely with Defendant to surreptitiously orchestrate the conversion of the LRGH business. In order to keep Plaintiffs from discovering that he was selling Defendant's Products to LRGH, Brown utilized his Personal Email when doing business with LRGH on behalf of Defendant and his Thermal Surgical email when communicating with Plaintiffs.

47.     In October 2014, Thermal Surgical began questioning Brown about the decline of sales to LRGH. Rather than telling Thermal Surgical the truth (that the LRGH Surgeons were using Defendant's Products), Brown blamed the decline on, among other things, a downturn in surgeries and issues surrounding insurance reimbursements.

48.     While Plaintiffs' business at LRGH dwindled, Brown continued soliciting the LRGH surgeons on Defendant's behalf, working with the LRGH Surgeons' staffs to schedule surgeries in which the LRGH Surgeons would utilize Defendant's Products, and supporting surgeries in which the LRGH Surgeons used Defendant's Products.

49.     Above and beyond Brown's daily work for Defendant, Brown, without limitation, and via his Personal Email:

> a.  asked, on October 24, 2014, the LRGH Surgeons' assistant for permission to meet with the LRGH Surgeons "to review specifics of upcoming cases" in which the LRGH Surgeons would utilize Defendant's Products;

8

b. shared, on November 4, 2014, his notes with one of the LRGH Surgeons that described changes the LRGH Surgeons wanted in certain surgical tools and implants distributed by Defendant;

c. accompanied, on or about November 20, 2014, one of the LRGH Surgeons to a "lab" conducted by a company that distributes its products through Defendant in order to familiarize the LRGH Surgeon with that company's products;

d. along with at least one other representative of Defendant, met, on November 25, 2014, with one of the LRGH Surgeons and solicited his usage of a bone growth stimulation system distributed by Defendant;

e. participated in a December 8, 2014, email exchange with one of Defendant's owners, Michael Deraps ("Deraps"), and one of the LRGH surgeons in which Deraps informed the LRGH Surgeon that Defendant distributed a surgical instrument which would satisfy the surgeon's needs for an upcoming surgery;

f. met, on December 11, 2014, at least one of Defendant's representatives and one of the LRGH Surgeons for dinner at the Chop House in Manchester, New Hampshire (when scheduling this dinner, the LRGH Surgeon's office coordinator inquired as to whether this dinner alleviated the need for the doctor to attend a lunch with Brown and Wilson); and

g. invited, on January 5, 2015, one of the LRGH Surgeons to join him for dinner with Wilson "to review implant options for your upcoming cases."

Plaintiffs attach the email exchanges reflecting these acts as **Exhibits D** through **J**, respectively.

50. Brown's and Defendant's joint efforts led to a complete conversion of the LRGH business from Plaintiffs to Defendant.  Indeed, as evidenced by a January 13, 2015, email from one of the LRGH Surgeons' staff members to Brown's Personal Email, the LRGH Surgeons utilized whichever products Brown chose.

51. The above-referenced January 13, 2015, email stated, in part:  "We need to know please what system will be brought in for this.  Dr. S leaves it up to you and LRGH won't book anymore until they know what the equipment is.  Can you let me know asap please?"  Brown responded "[W]orking on it.  Will get back to you shortly.  Thanks."  Later that day, Brown

informed the office coordinator that he would supply products distributed by Defendant for the surgery.  Plaintiffs attach this email exchange as **Exhibit K**.

52.     Other evidence of Brown's and Defendant's complete conversion of the LRGH business includes, without limitation:

   a.   on January 15, 2015, one of the LRGH Surgeon's staff members asked Brown (via his Personal Email) what are we using for ALIF nowadays"; Brown responded "Lanx Durango system,"

   b.   on January 20, 2015, Brown (via his Personal Email) asked one of the LGRH Surgeons' staff members for information about an upcoming surgery; and the staff member responded, in part, "[W]hatever you say for equipment...LOL"; and

   c.   on January 23, 2015, one of the LRGH Surgeon's staff members asked Brown (via his Personal Email) "[W]hat are we using for XLIF nowadays please? Sorry I have to keep bothering you with these"; to which Brown informed the staff member that the LRGH surgeon will use Pinnacle products for certain surgeries and Biomet/Lanx's products for others.

Plaintiffs attach these email exchanges as **Exhibits L** through **N**, respectively.

**Brown continues to work on Defendant's behalf at LRGH after Thermal Surgical terminates his employment**

53.     On February 25, 2015, Thermal Surgical's owners confronted Brown about the unexplained loss of sales to LRGH, and terminated his employment when he failed to deny marketing competitive products to LRGH.  That morning, Brown (via his Personal Email) confirmed an upcoming surgery in which one of the LRGH Surgeons would utilize products distributed by Defendant.  Plaintiffs attach this email confirmation as **Exhibit O**.

54.     Brown did not stop working on behalf of Defendant at LRGH after being terminated.

55.     Within minutes of being terminated, Brown informed one of the LRGH Surgeons (via his Personal Email) that he would no longer be able to support surgeries in which NuVasive

products are used, and that he would "be in touch" with the surgeon.  Plaintiffs attach this email as **Exhibit P**.

56.     On March 4, 2015, Brown (via his Personal Email) informed one of the LRGH Surgeons' staff members that he would "be in the area tomorrow" and asked if he "might grab a schedule for Dr. S and Dr. L cases booked through April."  The next day, Brown informed the office coordinator that he would be at LRGH "this afternoon" and stated "[P]erhaps I can swing by . . . ?"  Plaintiffs attach this email exchange as **Exhibit Q**.

57.     Brown continued working on behalf of Defendant at LRGH through June 29, 2015.  On that date Brown telephoned the LRGH Surgeons' office and asked that they schedule surgeries through Deraps rather than himself.  One of the LRGH Surgeons' staff members responded to this news by emailing Brown (via his Personal Email) "What?? I'm not to email cases to you anymore?  Do I email Mike for all the cases I would typically send to you.  This is sad!!!"  Plaintiffs attach this email exchange as **Exhibit R**.

58.     Deraps is the "Mike" mentioned in the above-referenced June 29, 2015, email.

59.     Brown communicated with the LRGH Surgeons and/or their staff on a weekly, if not daily, basis for purposes of conducting business on behalf of Defendant, between the time Thermal Surgical terminated his employment and June 29, 2015.

**Brown and Defendant deny any wrongdoing and deny relevant evidence**

60.     On March 24, 2015, Plaintiffs' counsel wrote a cease and desist letter to Brown.  Through their attorneys, Brown and Defendant denied violating his duty of loyalty or any of his contractual obligations not to sell products that compete with Plaintiffs' products.

61.     After Thermal Surgical filed suit against Brown, he, on December 14, 2015, filed a verified answer, counterclaim, and third-party complaint in which he claimed, under oath, that he

did not violate his duty of loyalty or any of his contractual obligations not to sell products that compete with Plaintiffs' products.

62.     Through discovery responses, Brown consistently swore that he did not violate any of his obligations to Plaintiffs during the course of the litigation with Thermal Surgical (which is currently stayed as a result of Brown filing for bankruptcy).

63.     In response to a subpoena issued by Thermal Surgical in the litigation against Brown, Defendant denied possessing any documents relevant to this dispute.  Plaintiffs' attach Defendant's response to the subpoena as **Exhibit S**.

64.     Upon information and belief, both Brown and Defendant intentionally destroyed evidence relevant to the previous lawsuit between Thermal Surgical and Brown and this lawsuit.

## <u>Count I</u>
### (Aiding and Abetting Brown's Breach of his Duty of Loyalty)

65.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 64.

66.     As Plaintiffs' exclusive sales representative, Brown held a position of trust and confidence with Plaintiffs.  Accordingly, Brown owed Plaintiffs a duty of loyalty during the time he served as their exclusive sales representative.

67.     Brown violated that duty of loyalty by, while serving as Plaintiffs' exclusive sales representative, soliciting the LRGH Surgeons' business, scheduling surgeries in which the LRGH surgeons would utilize Defendant's products, converting the LRGH Surgeons' business to Defendant, and supporting surgeries in which the LRGH surgeons utilized Defendant's Products.

68.   Defendant knew that Brown owed NuVasive and Thermal Surgical a duty of loyalty and knew that Brown's conduct violated that duty of loyalty.  Nevertheless, by, without limitation, working with Brown to solicit business from the LRGH Surgeons, accepting orders for

Defendant's Products from Brown, allowing Brown to support surgeries where the LRGH Surgeons utilized Defendant's Products, and rewarding Brown for his work on its behalf, Defendant substantially assisted and encouraged Brown in violating his duty of loyalty.

69.     Defendant's actions caused NuVasive and Thermal Surgical to suffer harm.

**Count II**
**(Tortiously Interfering with Brown's Contractual Obligation not to Represent Competitive Spine Companies During his Thermal Surgical Employment)**

70.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 69.

71.     The Conflicts of Interest provisions in the 2013 and 2014 Agreements preclude Brown from representing competitive spine companies while employed by Thermal Surgical.

72.     Defendant knew or should have known that Brown was contractually precluded from working for it while he was Plaintiffs' exclusive sales representative.

73.     Nevertheless, Defendant knowingly induced Brown to violate these contractual obligations by, without limitation, working with Brown to solicit business from the LRGH Surgeons, accepting orders for Defendant's Products from Brown, allowing Brown to support surgeries where the LRGH Surgeons utilized Defendant's Products, and rewarding Brown for his work on its behalf.

74.     Defendant utilized improper means when it knowingly induced Brown's violation of the Conflicts of Interest provisions of the 2013 and 2014 Agreements, and caused Plaintiffs to suffer harm.

75.     Defendant's actions caused NuVasive and Thermal Surgical to suffer harm.

### Count III
**(Tortiously Interfering with Brown's Post-Employment Non-Compete Obligations)**

76.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 75.

77.     The 2013 and 2014 Agreements contain non-competition and non-solicitation provisions which, among other things, preclude Brown from competing with Plaintiffs for LRGH's business for fifteen and eighteen months, respectively, after his Thermal Surgical employment ends.

78.     Defendant knew or should have known that Brown was subject to the non-competition and non-solicitation provisions contained in the 2013 and 2014 Agreements.

79.     Nevertheless, Defendant knowingly induced Brown to violate these contractual obligations by, without limitation, working with Brown to solicit business from the LRGH Surgeons, accepting orders for Defendant's Products from Brown, allowing Brown to support surgeries where the LRGH Surgeons utilized Defendant's Products, and awarding Brown for his work on its behalf.

80.     Defendant utilized improper means when it knowingly induced Brown to breach the 2013 and 2014 Agreements' non-competition clauses and non-solicitation provisions, and caused Plaintiffs to suffer harm.

81.     Defendant's actions caused NuVasive and Thermal Surgical to suffer harm.

### Count IV
**(Mass. G.L. c. 93A – Unfair or Deceptive Acts or Practices/Unfair Competition)**

82.     Plaintiffs repeat and incorporate by reference the allegations set forth in paragraphs 1 through 81.

83.     Massachusetts General Laws Chapter 93A makes it unlawful to utilize unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

84.     Defendant's actions in aiding and abetting Brown's breach of the duty of loyalty he owed to Plaintiffs constitute unfair acts and practices for purposes of Chapter 93A.

85.     Defendant's actions in tortiously interfering with Brown's contractual obligations not to represent competitive spine companies during his Thermal Surgical employment constitute unfair acts and practices for purposes of Chapter 93A.

86.     Defendant's unfair acts and practices in the conduct of trade or commerce have caused substantial injury to Plaintiffs.

87.     The unfair business practices, inequitable market conduct and unfair competition took place primarily and substantially within the Commonwealth of Massachusetts.

88.     Plaintiffs are entitled to recover treble damages and its reasonable attorneys' fees and costs pursuant to Massachusetts General Law Chapter 93A, Section 11.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendant and award them the following relief:

A.     Compensatory damages in an amount to be determined at trial;

B.     A judgment that Defendant has engaged in unfair and deceptive trade practices in violation of Mass. G.L. c. 93A;

C.     An award of multiple or treble damages incurred by Plaintiffs as a result of Defendant's willful and knowing violation of Mass. G.L. c. 93A;

D.     Reasonable attorney's fees and cost incurred prosecuting this action;

E.     Pre- and post-judgment interest; and

F.     Such other and further relief the Court deems just and proper.

**Jury Demand**

Plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully submitted,
**NUVASIVE, INC.**
**and THERMAL SURGICAL, LLC,**
By their attorneys,


*/s/ Michael S. Batson*
Holly M. Polglase (BBO #553271)
hpolglase@hermesnetburn.com
Michael S. Batson (BBO #648151)
mbatson@hermesnetburn.com
Matthew E. Bown (BBO #687184)
mbown@hermesnetburn.com
HERMES, NETBURN, O'CONNOR &
SPEARING, P.C.
265 Franklin Street, Seventh Floor
Boston, MA 02110-3113
Tel: (617) 728-0050
Dated: October 12, 2016          Fax: (617) 728-0052

Christopher W. Cardwell, Esq. (*pro hac vice*
forthcoming)
ccardwell@gsrm.com
GULLETT, SANFORD, ROBINSON & MARTIN,
PLLC
150 Third Avenue South, Suite 1700
Nashville, TN 37201
Tel: (615) 244-4994
Fax: (615) 256-6339